

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00025-CV

_____

B.E.K., Appellant

V.

C.E.O., Appellee

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. D2022080

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant B.E.K. (Mother) and Appellee C.E.O. (Father) filed competing applications for protective orders.[1] The trial court granted Father's application, finding that Mother had committed family violence and that family violence was likely to occur in the future and awarding Father $10,000 in attorney's fees. In three appellate issues, Mother argues that (1) the evidence was legally and factually insufficient to support the trial court's family-violence findings; (2) the evidence was legally and factually insufficient to support the award of attorney's fees; and (3) the trial court erred in denying her protective-order counterapplication. We will affirm.

## I. BACKGROUND

### A. PRETRIAL PROCEDURE

This case has its roots in a parental-rights termination case that was instituted against Mother and Father in 2021 after their infant son, Carlo, suffered what was believed to be intentional head and brain trauma. Though it was not entirely clear who had injured Carlo, the Department of Family and Protective Services (DFPS) concluded that it had reason to believe that Mother was the culprit. After an eight-day trial, the jury found that both Mother and Father had endangered the child, but

---

[1]Because this case is fundamentally related to a parental–rights termination case, we will use the same initials and aliases used in that case for the names of the child and his family members for consistency and to protect the child's privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b); *see In re C.E.*, No. 02-22-00285-CV, 2023 WL 170762, at *2 (Tex. App.—Fort Worth Jan. 12, 2023, pet. granted) (mem. op.) (*C.E. I*) *rev'd*, 687 S.W.3d 304 (Tex. 2024) (*C.E. II*).

found that only Mother's parental rights should be terminated. It further found that Father should be named Carlo's sole managing conservator. The trial court entered its termination order accordingly.[2]

Soon after the termination trial's conclusion, Father filed an application (under the Texas Family Code) for a protective order against Mother, alleging that she had committed family violence against Carlo and had stalked Father and his parents.[3] Mother responded by filing (under the same trial court cause number as Father's application) a counterapplication for a protective order against Father, likewise alleging that he had engaged in family violence against Carlo and stalking.

A bench trial was held on the protective-order applications. At the request of both parties, the trial court took judicial notice of all evidence that had been entered at the termination trial.[4]

---

[2]Mother appealed that order to this court. *See C.E. I*, 2023 WL 170762, at *2. In *C.E. I*, we reversed the trial court's termination order, holding, among other things, that the evidence was legally insufficient to support termination of Mother's parental rights on endangerment grounds; namely, that it did not support a finding that Mother had injured Carlo or that her mental health conditions endangered his physical or emotional well-being. *Id.* at * 22. The supreme court disagreed, reversing our judgment and holding that the evidence was legally sufficient to support the finding that Mother had engaged in conduct that endangered Carlo's well-being. *C.E. II*, 687 S.W.3d 304 at 314.

[3]Father also applied for a protective order against Mother's father, which the trial court denied via a directed verdict at the protective-order trial. This appeal does not concern that ruling.

[4]Though the parties did not file a Rule 263 stipulation of facts with the trial court, we will construe their joint request for the trial court to take judicial notice of

3

## B. RELEVANT TERMINATION-TRIAL EVIDENCE

Evidence at the termination trial showed that, in late February 2021, Carlo had suffered significant injuries, including a fractured skull, internal bleeding, and bleeding in his brain and retinas. A medical expert opined that these injuries were not accidental but, rather, the result of intentional, abusive force.

In the years leading up to Carlo being injured, Mother experienced several mental health episodes that required her to be admitted for psychiatric intervention.[5] One such episode occurred just weeks before Carlo was injured. Mother, who had voiced a desire to separate from Father,[6] had taken Carlo to a friend's house where they stayed for a few days. She then arrived unannounced at Father's front door holding Carlo. Father testified that Mother "could barely talk" and that she was shaking so badly that he took Carlo from her and she sat down. She told Father that

---

the facts of the termination case as a stipulation for it to do so. *See* Tex. R. Civ. P. 263; *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 735 (Tex. App.—Fort Worth 1996, writ denied) ("[W]hen the parties fail to conform to the technical requirements of [Rule 263], an appellate court may treat the case as a case involving an agreed statement of facts under Rule 263 if the record indicates that the trial court heard the case on stipulated facts."). In the interest of brevity, we will not repeat the extensive facts raised in the termination case. Instead, we will summarize the facts most pertinent to the protective-order issues and refer the reader to *C.E. I* and *C.E. II* for a more detailed discussion of the underlying facts. *See* 687 S.W.3d at 307–14; 2023 WL 170762, at *1–14.

[5]Mother had received diagnoses of major depressive disorder, post-traumatic stress disorder, and generalized anxiety disorder.

[6]Mother and Father were in a dating relationship.

"she was in crisis" and planned to go to the emergency room to "likely be hospitalized for two weeks."

Carlo was almost exclusively in Mother's care in the two weeks before he was injured. On February 24, 2021—the day it is believed that Carlo was injured—Carlo was exclusively in her care except for a brief period when his maternal grandfather cared for him in a public place. When Father arrived home from work that day at 7:00 p.m., he noticed that Carlo was fussier than usual and that Mother was visibly upset. Mother was reluctant to give Carlo to Father but eventually did. As Carlo slept on Father's chest, Father asked Mother if she was okay. Mother responded that she was not okay, speaking in a "flat" affect and staring absently. Father noticed that Carlo started screaming if he was moved or adjusted.

After a fitful night's sleep (during which Mother and Father took turns caring for Carlo), the family awoke, and Father decided to go to work because Mother and Carlo seemed to be doing better. However, Mother reported to Father throughout the day that Carlo was still fussy and that she had decided to take him to his pediatrician. The pediatrician was concerned that Carlo may have been experiencing seizures, so Carlo was taken to the hospital and admitted to the intensive care unit. It was there that his injuries came to light.

The supreme court in *C.E. II* summarized the evidence that led investigators to believe that Mother had abused Carlo:

Neither Mother nor Father could provide an explanation for the injuries, and each blamed the other. Carlo's only caregivers during the relevant timeframe were Mother and Father, except for a brief period when Carlo's maternal grandfather . . . cared for him in a public place.

Investigators were initially concerned that Father had physically abused Carlo, but, as the investigation progressed, they concluded that it was likely Mother who had done so. Both the attorney ad litem and the court appointed special advocate . . . representative for Carlo recommended terminating Mother's rights, and DFPS dropped the termination ground it had alleged against Father at trial. Mother was Carlo's primary caregiver, and the timing of Carlo's symptoms suggested the injury was likely inflicted when Carlo was in her care. This evidence, along with additional information such as Mother's behavior during the investigation, inability to answer questions consistently, and relevant mental health indicators, ultimately led DFPS to seek termination of Mother's parental rights.

*C.E. II*, 687 S.W.3d at 307–08.

## B. PROTECTIVE-ORDER TRIAL

Father and Mother both testified at the protective-order trial. Father testified that Mother had been the one who "attacked" Carlo, based largely on the investigation into Carlo's injuries and the evidence adduced at the termination trial. He alleged that Mother had filed numerous "unfounded" complaints against his veterinarian licenses in multiple states. He stated that she had repeatedly harassed and followed him and his parents—showing up at their homes and places of employment. According to Father, Mother had also hired private investigators to follow them. Father was worried that Mother planned to abduct Carlo from him.

Father testified that, in a prior court hearing, Mother had made a "throat-slashing motion" toward him while mouthing a threat. Father also became aware of

6

concerning text messages sent from Mother to her former colleagues at a Houston veterinary clinic where she used to work. Valerie—the owner of that clinic—had been arrested for hiring a hitman to kill her ex-husband. After Carlo had been injured, Mother sent text messages to these former colleagues in which she blamed Father for injuring Carlo and stated, "Now I understand Valerie so much better." Father testified that he was so fearful of Mother and Mother's father that he wore a bullet-proof vest, though he had never seen her with a gun. It was Father's belief that Mother was "very capable of harming and murdering" him, Carlo, and Father's parents.

Mother testified that she had never threatened or physically harmed Father, the child, or Father's parents and that Father had caused the child's injuries. She stated that she had only hired a private investigator for discovery purposes. Mother alleged that, while she was still living with Father, he had installed cameras to watch her without her consent and that those cameras "were stalking and harassing." She testified that her protective-order application was based on threatening text messages sent by Father in which he stated that he would "hand-deliver coronavirus" to Mother's mother and that he "had a meat grinder and a deep chest freezer" for her father. She also alleged that Father had threatened to shoot Pearl—Mother's emotional support pet pig—via text messages that included pictures of a handgun. Finally, Mother testified that, on one occasion, Father had driven behind her across county lines and tried to run her off the road.

## B. ATTORNEY'S FEES

The trial court heard evidence related to Father's request for attorney's fees, which included an affidavit and billing records from his attorneys. These records show that three attorneys, a law clerk,[7] and three paralegals performed work on Father's case against Mother. One attorney (SJB) billed 6.625 hours of work at an hourly rate of $575; another (MPR) billed 18.185 hours at $225 per hour; and a third (AM) billed 2.15 hours of work at $275 per hour. The law clerk billed 13.345 hours at a rate of $175 per hour, and the paralegals together billed 8.495 hours at hourly rates between $125 and $175 per hour.

Father requested $14,864.30 for his attorney's fees. The billing records provide entries for each task performed that include a description of the task (with certain information redacted), who performed each task and when, and the number of hours worked on each task.

One of Father's attorneys also testified briefly about the requested fees. He testified that the fees were reasonable and necessary for this case but conceded that he had not spoken with other attorneys in Hood County about what they customarily billed. Mother's counsel objected to Father's attorney's fees as exorbitant, explaining:

---

[7]The law clerk was described in the affidavit as being "qualified by training and experience to perform the services rendered in this matter." It was further attested that the law clerk worked "under the direction and supervision" of attorneys at the firm and performed tasks that an attorney would ordinarily provide.

I think this is frivolous that they filed it after the fact of the jury trial. I think they did that in [an] attempt to try to drum up legal fees. I think that 575 per hour is not in line with customary legal fees in Hood County for a protective order.

. . .

Just for comparison's sake, Your Honor, I bill at $350 per hour. I'm a board certified attorney in this area, and my total bill for this entire protective order before today sits at $4,500.

The trial court did not rule on Mother's objection. Mother filed a motion for new trial that argued broadly that the attorney's fees award was not supported by sufficient evidence.

## C. TRIAL COURT'S RULINGS

The trial court granted Father's protective order and awarded him $10,000 in attorney's fees. Its findings of fact and conclusions of law included the following:

**Findings of Fact**

The Court finds the testimony of [Father] credible testimony.

The Court find[s] the testimony of [Mother] not credible testimony.

. . . .

The Court finds that family violence has occurred and that family violence is likely to occur in the future.

The Court finds that [Mother] has committed family violence.

. . . .

The Court finds that [Father] is fearful of [Mother] committing imminent physical harm, bodily injury, and/or assault on [Father], [the paternal grandfather], [the paternal grandmother], or [Carlo].

9

. . . .

The Court finds that issuance of a protective order[] is for the safety and welfare and in the best interest of [Father], [the paternal grandfather], [the paternal grandmother], and/or [Carlo].

. . . .

The Court finds the testimony of, [Father's attorney], concerning attorney's fees credible testimony.

The Court finds . . . attorney's fees in the amount of ten thousand dollars ($10,000) for the services rendered in this cause of action are reasonable and necessary and evidence was presented supporting such.

**Conclusions of Law**

[Mother] has engaged in conduct that constitutes family violence under Tex. Fam. Code. § 71.004.

. . . .

[Mother] committed family violence and shall pay reasonable attorney['s] fees for the services of [Father's attorneys] in accordance with Tex. Fam. Code § 81.005(a).

Though the trial court orally pronounced that it was denying Mother's counterapplication for protective order, there is no written order in the record denying Mother's counterapplication.

10

## II. DISCUSSION

### A. FAMILY-VIOLENCE FINDINGS

In her first issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's findings that she had committed family violence and that family violence was likely to occur in the future. We disagree.

### 1. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and, when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Id.* In a bench trial, findings of fact are the exclusive province of the trial court, making it the sole judge of the witnesses' credibility. *Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 913 (Tex. App.—Fort Worth, pet. denied).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn*

*v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

If the evidence is factually sufficient, then it is necessarily legally sufficient as well. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op).

## 2. Relevant Law

Under the then-effective version of Texas Family Code Section 81.001, the trial court was required to render a protective order if it found by a preponderance of the evidence "that family violence has occurred and is likely to occur in the future."[8] Act of June 17, 1997, 75th Leg., R.S., ch. 34, § 1, 1997 Tex. Gen. Laws 77 (amended 2023) (current version at Tex. Fam. Code Ann. § 81.001); *see Roper v. Jolliffe*, 493 S.W.3d 624, 638 (Tex. App.—Dallas 2015, pet. denied) (holding that family-code protective-order proceedings are civil in nature and, thus, the standard of proof by a preponderance of the evidence applies). "Family violence" is defined to include "abuse [as defined by Section 261] by a member of a family or household toward a child of the family or household." Tex. Fam. Code Ann. § 71.004(2). "Abuse" includes engaging in acts or omissions that cause "physical injury that results in substantial harm to the child." *Id.* § 261.001(1)(C). "Family" includes "individuals who are the parents of the same child, without regard to marriage." *Id.* § 71.003.

Evidence of past abusive conduct permits an inference that violent behavior will continue in the future. *Huskins v. Garcia*, No. 02-21-00328-CV, 2022 WL 3905083, at *3 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) (mem. op.). A finding that family violence is likely to occur in the future can be based on a single act

---

[8]A newer version of Section 81.001 (which deleted the "is likely to occur in the future" component) went into effect on September 1, 2023, and does not apply to this case. *See* Tex. Fam. Code Ann. § 81.001.

of past family violence. *Boyd v. Palmore*, 425 S.W.3d 425, 432 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.) ("Oftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order.").

### 3. Analysis

There was sufficient evidence to support the trial court's findings that Mother committed family violence and that it was likely to occur in the future, particularly in light of the fact that the trial court found Father's testimony credible, but not Mother's. That evidence includes:

- Carlo suffered a fractured skull, internal bleeding, and bleeding in his brain and retinas.

- A medical expert opined that Carlo's injuries were the result of abuse.

- Carlo was almost exclusively in Mother's care during the time period in which it is believed that he was injured, but she could not provide any explanation for his injuries.

- On the day that Carlo is believed to have been injured, Mother was visibly upset, said that she was not okay, stared absently, and spoke with a flat affect.

- On that day, Mother was reluctant to give Carlo to Father, and Father noticed that Carlo started to scream if he was moved or adjusted.

- Mother gave inconsistent answers to investigatory questions.

- Mother was experiencing the effects of serious mental health issues around the time that Carlo was injured.

14

- Mother repeatedly followed Father and his parents, sometimes showing up at their homes and workplaces.

- Father testified that it was Mother who harmed Carlo, and DFPS investigators concluded the same.

- Father was worried that Mother planned to abduct Carlo from him.

- Mother had hired private investigators to follow Father and his parents.

- At a prior court hearing, Mother made a "throat-slashing motion" toward Father while mouthing a threat.

- Mother sent text messages to former colleagues in which she expressed empathy for their former boss who had hired a hitman to kill the boss's ex-husband.

- Father was so fearful of Mother that he wore a bullet-proof vest and testified that Mother was "very capable of harming and murdering" him, Carlo, and his parents.

- A jury found that Mother had endangered Carlo and that termination of her parental rights was in Carlo's best interest.

After considering and weighing all of the pertinent evidence, we hold that the evidence was not so weak or contrary to the overwhelming weight of all the evidence so as to make the trial court's findings clearly wrong or unjust. *See Ellis*, 971 S.W.2d at 407. Because the evidence was factually sufficient, it was also legally sufficient. *A.S.*, 2016 WL 3364838, at *7. We overrule Mother's first issue.

## B. ATTORNEY'S FEES

In her second issue, Mother contends that the evidence was legally and factually insufficient to support the award of $10,000 for Father's attorney's fees.

15

First, she argues that—because the family code only allows for an award of attorney's fees in protective-order cases upon a finding of family violence—the trial court abused its discretion in awarding Father his fees because the evidence was insufficient to support a finding of family violence. Alternatively, she raises various arguments as to why the evidence was insufficient to support Father's attorney's-fees award. Again, we disagree.

### 1. Standard of Review and Relevant Law

A factfinder's starting point for calculating an attorney's-fees award is to determine the reasonable hours worked multiplied by a reasonable hourly rate; the fee claimant bears the burden of providing sufficient evidence on both counts. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). Sufficient evidence, at a minimum, includes evidence of (1) particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing the services. *Id.* at 498, 502. Reasonableness and necessity are not dependent solely on the contractual fee arrangement between the prevailing party and its attorney; the base lodestar calculation should reflect hours reasonably expended for services necessary to the litigation and a reasonable hourly rate for the attorney to prosecute or defend successfully against the claim at issue. *Id.* at 498–99; *El Apple I, Ltd. v. Olivas*,

370 S.W.3d 757, 760 (Tex. 2012) (explaining that the trial court calculates the lodestar).

Contemporaneous billing records are not strictly required to prove the reasonableness and necessity of the requested fees but are strongly encouraged. *Rohrmoos*, 578 S.W.3d at 502. While generalities about tasks performed are not sufficient for the factfinder to meaningfully review whether the tasks and hours were reasonable and necessary, *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014), "[t]he fact[]finder will generally not benefit from attorneys cross-examining each other point-by-point on every billable matter," *Rohrmoos*, 578 S.W.3d at 503 (stating that the supreme court does not endorse "satellite litigation as to attorney's fees" and that "[p]arties should use discovery and pretrial procedure to evaluate attorney's fees claims and the evidence supporting them, then present to the fact[]finder the evidence relevant to determining" what fees are reasonable and necessary).

In a protective-order proceeding brought under the family code, a trial court "may assess reasonable attorney's fees against the party found to have committed family violence." Tex. Fam. Code Ann. § 81.005.

## 2. Analysis

Mother first argues that the trial court could not award Father his attorney's fees under Texas Family Code Section 81.005 because the evidence was legally and factually insufficient to support the trial court's finding that she had committed family

17

violence. We overrule this portion of Mother's second issue because we have already held that the evidence was sufficient to support the family-violence findings.

The evidence was likewise sufficient to support the attorney's-fees award. Father admitted an affidavit and billing records from his attorneys that showed (1) the particular tasks performed, (2) who performed them, (3) when they were performed, (4) the amount of time expended on them, and (5) the hourly rate billed for each person who performed them. *See Rohrmoos*, 578 S.W.3d at 498. This is enough to meet the base lodestar calculation. *Id.* at 498–99.

Mother argues that no evidence supported the reasonability of Father's fees because his attorney testified that he had not spoken to any Hood County attorneys about their customary rate and, thus, he had no personal knowledge of the locally customary rate. This argument is unavailing because "[e]xpert opinion is competent evidence of attorney's fees, and the usual and customary fee charged by attorneys in the general locality or area shall be presumed to be reasonable unless rebutted by competent evidence." *Richard Gill Co. v. Jackson's Landing Owners' Ass'n*, 758 S.W.2d 921, 928 (Tex. App.—Corpus Christi 1988, writ denied) (internal quotation omitted). Father's attorneys attested and testified that the rates charged were reasonable for Hood County. And Mother did not provide any evidence to rebut the presumed veracity of those opinions. *Id.* Further, Mother's attorney informed the trial court that he customarily charged $350 per hour for his Hood County cases. The total

amount billed by Father's three attorneys averaged an hourly rate of roughly $315, comfortably less than the rate that Mother's attorney conceded was customary.

Mother also argues that the $591 of fees billed by AM (who was listed as an attorney in Father's attorney's-fees affidavit) was improperly included in the attorney's-fees award because AM was not yet a licensed attorney when he billed for his time on the case.[9] But, again, Mother did not produce any evidence to rebut the presumption raised by the affidavit that AM's charged fee was reasonable. *See Richard Gill Co.,* 758 S.W.2d at 928. And she does not point us to any legal authority that supports the proposition that mislabeling an unlicensed legal assistant as an attorney forecloses a party's right to recover fees for the work performed by that assistant or makes those fees *per se* unreasonable. To the contrary, attorney's-fees awards routinely include work completed by non-attorney legal staff. *See All Seasons Window & Door Mfg., Inc. v. Red Dot Corp.,* 181 S.W.3d 490, 504 (Tex. App.—Texarkana 2005, no pet.) (explaining that an attorney's-fees award may include legal assistant's time if the work performed was traditionally done by an attorney).

Next, Mother contends that the $2,335 billed by the law clerk was not reasonable because no description of his training and experience was provided. The attorney's-fees affidavit stated that the law clerk was "qualified by training and

---

[9]Father explains in his appellee's brief that AM worked as a summer associate until October 12, 2022, when he obtained his Texas attorney's license. The 2.15 hours that AM billed in this case occurred in late September 2022, about two weeks prior to his licensing.

experience to perform the services rendered in this matter." Again, Mother did not provide any evidence to rebut the expert opinion from the affidavit that the law clerk was qualified and experienced to perform his work in this case. *Richard Gill Co.*, 758 S.W.2d at 928.

Finally, Mother argues that the amount billed by the "legal assistants" was not reasonable due to redactions in their billing records that made it impossible to determine what tasks they performed, who performed them, and the nature of those tasks. This argument fails because the billing records *do* generally provide that information. Additionally, Mother did not use the proper discovery or pretrial procedures to evaluate these allegedly deficient time entries or submit evidence to refute any particular objectionable time entries. *See Rohrmoos*, 578 S.W.3d at 503.

And even if AM's fees (totaling $591), the law clerk's fees (totaling $2,335), and the paralegal's fees (totaling $1,345) were improperly considered by the trial court in calculating the lodestar amount, such consideration was harmless. Father requested $14,864 in attorney's fees, but the trial court reduced the award to only $10,000—a difference of $4,864. The sum of AM's, the law clerk's, and the paralegal's fees was $4,271. Thus, the reduction was more than enough to cover any alleged impropriety in the total fees charged for the legal assistants.

For these reasons, we hold that the evidence was sufficient to support the trial court's award of attorney's fees to Father. We overrule Mother's second issue.

## C. MOTHER'S COUNTERAPPLICATION

In her third issue, Mother complains that the trial court erred by denying her counterapplication for a protective order. However, though the trial court pronounced orally at the protective-order trial that it was denying Mother's counterapplication, there is no written order of denial in the record before us and neither party cites us to a written order in their appellate briefs.

An oral ruling not reduced to writing and signed by the trial court is not final or otherwise appealable. *Smith v. Bristol Myers Squibb Co.*, No. 05-00-01334-CV, 2002 WL 216118, at *2 (Tex. App.—Dallas Feb. 13, 2002, no pet.); *see* Tex. R. App. P. 26.1(a) (providing that time period for perfecting appeal begins when judgment is signed); *Morgan v. Walker*, No. 02-16-00219-CV, 2016 WL 4395803, at *1 (Tex. App.—Fort Worth Aug. 18, 2016, no pet.) (mem. op.). Because the record does not contain a written order on Mother's counterapplication, we overrule Mother's third issue.[10]

---

[10]Even though Mother's counterapplication is still pending before the trial court, we have jurisdiction over her appeal of the trial court's order granting Father's application. Texas Family Code Section 81.009 provides that a protective order is immediately appealable unless it was rendered against (1) a party in a suit for dissolution of marriage or (2) a party in a suit affecting the parent–child relationship before a final, appealable order is entered in that suit. Tex. Fam. Code Ann. § 81.009; *see Watts v. Adviento*, No. 02-17-00424-CV, 2019 WL 1388534, at *2 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op.). Because neither of those exceptions apply here, Mother could immediately appeal from the order on Father's application. *See Watts*, 2019 WL 1388534, at *2.

## III.  CONCLUSION

Having overruled all of Mother's issues, we affirm the trial court's protective order for Father.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  June 27, 2024